**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| EMMA JEAN ANDERSON, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08-cv-535 (RCL) |
| | ) | |
| THE ISLAMIC REPUBLIC OF IRAN, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

## I.     INTRODUCTION

This action arises out of the devastating 1983 bombing of the U.S. Marine barracks in

Beirut, Lebanon.  The attack decimated the facility, killed 241 U.S. servicemen and left countless

others wounded, and caused severe injuries to servicemen Dennis Jack Anderson, Jr., Pedro J.

Alvarado and Willie George Thompson.  Various family members of these three servicemen now

bring suit against defendants Islamic Republic of Iran ("Iran") and the Iranian Ministry of

Information and Security ("MOIS").  Their action is brought pursuant to the state-sponsored

exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq*.,

which was enacted as part of the National Defense Authorization Act for Fiscal Year 2008

("NDAA").  Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008).  That provision, codified

at 28 U.S.C. § 1605A, provides "a federal right of action against foreign states."  *Simon v.*

*Islamic Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008).  In particular, plaintiffs allege

that defendants, by both creating and supporting the terrorist organization Hezbollah and

directing that organization to take 'spectacular action against the United States Marines'

stationed in Lebanon, are legally responsible for the severe mental anguish and emotional toll that the barracks bombing wreaked upon them. For the reasons set forth below, the Court finds that plaintiffs have provided sufficient proof to support their causes of action, and determines that defendants are liable under the FSIA's state-sponsored terrorism exception.

## II. PROCEDURAL HISTORY

### A. Prior Beirut Bombing Litigation

There is a lengthy history of litigation before this Court concerning the 1983 bombing of the U.S. Marine barracks in Beirut. In the seminal case, *Peterson v. Islamic Republic of Iran*, dozens of plaintiffs consisting of family members of the 241 deceased servicemen, as well as several injured survivors of the attack, sued defendants Iran and MOIS, seeking to hold them liable for the horrific act under the former state-sponsored terrorism exception, which at that time was codified at 28 U.S.C. § 1605(a)(7). 264 F. Supp. 2d 46, 48 (D.D.C. 2003) (Lamberth, J.). Over two days in March of 2003, the Court conducted a bench trial at which it heard testimony from lay and expert witnesses and received documentary evidence concerning the horrific attack, the grave injuries many suffered, defendants' involvement in the bombing, and their support for international terrorism more broadly. *See generally id*. at 48–59 (discussing evidence and findings of fact). Based on that evidence, the Court found "that it is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government. . . . [and] that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran." *Id*. at 58. The Court then determined, as a legal matter, that "MOIS actively participated in the attack" and was "acting as an agent of . . . Iran" when doing so, and thus defendants Iran and MOIS were "jointly and severally liable to the plaintiffs" for damages. *Id*. at 61. The Court left the determination of

damages in *Peterson* to another day following further findings of fact by several special masters appointed to assist the Court. *Id*. at 65.

Several new suits against Iran and MOIS were filed in the wake of the determination of defendants' liability in *Peterson*. Of greatest importance for these purposes is the case of *Valore v. Islamic Republic of Iran*, in which three servicemen at the center of this case were plaintiffs. 700 F. Supp. 2d 52, 61 n.1 (D.D.C. 2010) (Lamberth, J.). In addition, various family members of these three servicemen "brought claims for intentional infliction of emotional distress, seeking solatium." *Id*. at 60 & 61 n.4.[1] The Court, relying extensively on the evidence presented in *Peterson*, determined that "defendants are liable for extrajudicial killing and the provision of material support and resources for such killing, which was committed by officials, employees, and agents of defendants; which caused injury under several theories of liability; and for which the Court has jurisdiction for money damages." *Id*. at 80–81. The Court then awarded compensatory and punitive damages, totaling $290,291,092 and $1,000,000,000, respectively. *Murphy v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 06 Civ. 596, 2010 U.S. Dist. LEXIS 101250, *80 (D.D.C. Sep. 24, 2010) (summarizing awards in *Valore*). Subsequent to the opinion in *Valore*, several other cases related to the 1983 attack, including this one, remained pending before this Court.

## B.     This Action

While the claims brought by servicemen Dennis Jack Anderson, Jr., Pedro J. Alvarado, and Willie George Thompson, and some of their family members was pending before this Court in *Valore*, plaintiffs here, who are other family members of these servicemen not included in the *Valore* suit, brought a separate action under former § 1605(a)(7). Complaint, Mar. 27, 2008 [3].

---

[1] *Valore* was eventually consolidated with *Arnold v. Islamic Republic of Iran*, No. 06 Civ. 516, *Spencer v. Islamic Republic of Iran*, No. 06 Civ. 750, and *Bonk v. Islamic Republic of Iran*, No. 08 Civ. 1273, all of which arose out of the 1983 bombing of the Marine barracks. *Valore*, 700 F. Supp. 2d at 57.

Then, following the enactment of the NDAA, plaintiffs filed an Amended Complaint seeking retroactive application of § 1605A under the related action procedures found in the NDAA. Amended Complaint ¶ 1, Nov. 25, 2009 [6]. Plaintiffs here are the mother, father[2] and brother of serviceman Anderson, the estates of serviceman Alvarado's parents, and the estate of serviceman Thompson's father. *Id*. In the Complaint, plaintiffs allege the same essential facts concerning the barracks bombing that were established by sufficient evidence in *Peterson*, *id*. at ¶¶ 2, 6–9, and set forth claims of intentional infliction of emotional distress against the defendants. *Id*. at ¶¶ 10–15. The Complaint also states a separate claim for "Exemplary Damages," in which plaintiffs allege that defendants' conduct was "malicious, misanthropic, willful, unlawful, and in wanton disregard of life and the standards of law which govern the actions of civilized nations." *Id*. ¶ 17.

Plaintiffs served copies of the relevant papers, along with translations, by diplomatic channels through the U.S. Department of State, as required by 28 U.S.C. § 1608(a)(4). According to the diplomatic note, service was effected June 1, 2010. Return of Service/ Affidavit, Aug. 20, 2010 [21]. Under the terms of § 1605A, defendants had 60 days from that date—until August 1, 2010—to respond. 28 U.S.C. § 1608(d). In early November, after none of the defendants had appeared or responded to the Amended Complaint, the Clerk of the Court entered default on their behalf. Clerk's Entry of Default, Nov. 5, 2010 [27]. Plaintiff subsequently requested that this Court take judicial notice of the proceedings in *Peterson*, and moved for default judgment. Motion for Default Judgment, Nov. 5, 2010 [26]. Based on that motion, the record, and facts available for judicial notice, the Court makes the following findings of fact and conclusions of law.

---

[2] According to the Complaint, serviceman Anderson's father, Dennis Jack Anderson, Sr., died in late 2000, and is thus represented here by his wife, as administrator of his estate. *Id*. at ¶ 1.

## III.    FINDINGS OF FACT

The Clerk of the Court entered defendants' default on November 5, 2010.  However, prior to entry of final default judgment, the FSIA requires that courts evaluate the evidence before them to ensure that plaintiffs have established their right to relief "by evidence that is satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default."  *Rimkus v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 08 Civ. 1615, 2010 U.S. Dist. LEXIS 120991, at *13–14 (D.D.C. Nov. 16, 2010) (internal quotations omitted).

In considering whether to enter default judgment, courts in FSIA cases look to various sources of evidence to satisfy their statutory obligation.  Courts may, for example, rely upon plaintiffs' "'uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence.'"  *Valore*, 700 F. Supp. 2d at 59 (alteration in original; quoting *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)).  In addition to more traditional forms of evidence—testimony and documentation—plaintiffs in FSIA cases may also submit evidence in the form of affidavits.  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (citing *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006)).  Finally, a FSIA court may "'take judicial notice of related proceedings and records in cases before the same court.'"  *Valore*, 700 F. Supp. 2d at 59 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009)).  Here, plaintiffs rely entirely on this final form of evidence in support of their motion for default judgment.

### A.    Judicial Notice of Prior Related Cases

Under the Federal Rules of Evidence, courts are permitted to take judicial notice of facts "not subject to reasonable dispute" where those facts are either "generally known within the territorial jurisdiction" or are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This rule permits courts to take judicial notice of court records in related proceedings. 29 Am. Jur. 2d *Evidence* § 151 (2010); *see also Booth v. Fletcher*, 101 F.2d 676. 679 n.2 (D.C. Cir. 1938) ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . ."); 2 McCormick on Evid. § 332 (6th ed. 2009) (noting that principle permitting courts to take judicial notice of current proceeding "is equally applicable to matters of record in the proceedings in other cases in the same court"). Because of the multiplicity of FSIA-related litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings. *See, e.g.*, *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *11; *Valore*, 700 F. Supp. 2d at 59–60; *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009).

A difficult issue arises concerning judicial notice of related proceedings with regard to courts' prior findings of facts. While such findings in a prior proceeding are "capable of accurate and ready determination" from judicial records, Fed. R. Evid. 201(b), it cannot be said that these same findings are "not subject to reasonable dispute." *Id*. Specifically, such findings represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events. As such, they constitute hearsay, and thus are considered inadmissible. *Athridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 102, 110 (D.D.C. 2007) (citing *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994)).

This Court grappled with these difficulties in its recent opinion in *Rimkus*, where—"mindful that the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack," ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *18 (citing *Brewer*, 664 F. Supp. 2d at 54)—determined that the proper approach is one "that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced." *Id.* (citing *Murphy*, __ F. Supp. 2d __, 2010 U.S. Dist. LEXIS at *11). Thus, based on judicial notice of the evidence presented in the earlier cases—here, *Peterson* and *Valore*[3]—courts may reach their own independent findings of fact.

## B.    Relevant Findings of Fact

This action arises out of the devastating 1983 bombing of the U.S. Marine barracks in Beirut, Lebanon—an event that has been at the center of numerous FSIA suits. In support of their claims, plaintiffs ask this Court to take judicial notice of its previous findings in the *Peterson* case, during which the Court held a two-day bench trial on the issue of liability. 264 F. Supp. 2d at 48–49. Bearing in mind the parameters for judicial notice in FSIA actions set forth above, the Court takes notice of the evidence presented in *Peterson* and *Valore*, and renders the following findings of fact:

*Dennis Jack Anderson, Jr.*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that Dennis Jack Anderson, Jr. was born on October 13, 1958 in the United States, and has at all times in his life been a citizen of the United States. Report of Special Master (Anderson) 1, Dec.

---

[3] Though plaintiffs only requested that the Court take judicial notice of the proceedings in *Peterson*, Motion for Default Judgment at 1, the Court is permitted under the Federal Rules of Evidence to take judicial notice on its own initiative. Fed. R. Evid. 201(c). Thus, the Court also takes judicial notice of the proceedings in *Valore*, as that case involved testimony and documentary evidence concerning servicemen Anderson, Alvarado and Thompson which is relevant here. 700 F. Supp. 2d at 60–61 n.1 & n.4.

15, 2009, *Valore*, No. 03 Civ. 1959 [46]. Serviceman Anderson's testimony further establishes that he joined the Marines at age 18, was trained as a field Wireman, and was sent to Beirut with the 1st Battalion, 8th Marines as a float. *Id*. at 2.

*Pedro J. Alvarado*

Documentary evidence presented to the assigned special master in *Valore* shows that serviceman Alvarado was born in Puerto Rico on February 8, 1955, and was a United States citizen at all relevant times. Report of Special Master (Alvarado) 3, Feb. 19, 2010, *Valore*, No. 03 Civ. 1959 [50]. Serviceman Alvarado's testimony further establishes that that he joined the Navy in 1981, trained to become a Corpsman, and studied preventive medicine in field medical school with the Marine Corps. *Id*. at 4. Serviceman Alvarado was deployed to Beirut as a Corpsman at the time of the attack on the Marine barracks. *Id*. at 5.

*Willie George Thompson*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that Willie George Thompson was born on November 3, 1960 in the United States, and has at all times in his life been a citizen of the United States. Report of Special Master (Thompson) 3, Nov. 17, 2009, *Valore*, No. 03 Civ. 1959 [43]. Serviceman Thompson's testimony further establishes that he joined the Marine Corps in 1981 and was assigned to the headquarters company of 1st Battalion, 8th Marines based in North Carolina. *Id*. at 4. Serviceman Thompson was a Lance Corporal when he was deployed to Beirut. *Id*. at 5.

*Defendants*

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47. Defendant MOIS is the

secret police and intelligence organization of Iran. In *Valore*, this Court characterized MOIS as a "division of the state of Iran" that "acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah." *Valore*, 700 F. Supp. 2d at 53, 65.

*The Attack on the Marine Barracks*

Documentary evidence presented to this Court in *Peterson* establishes that in late 1982, the 24th Marine Amphibious Unit of the U.S. Marines—which included 1st Battalion, 8th Marines—was dispatched as part of an international peacekeeping coalition to the Lebanese capital of Beirut. *Peterson*, 264 F. Supp. 2d at 49. The rules of engagement issued to the servicemen in this unit clearly stated that they "possessed neither combatant nor police powers." *Id*. Indeed, numerous witnesses at the *Peterson* trial testified that these servicemen "were more restricted in their use of force than an ordinary U.S. citizen walking down a street in Washington, D.C." *Id*. at 50. As Col. Timothy Geraghty, the commander of the U.S. deployment testified: "The rules – these were geared primarily again with the peacekeeping mission [in mind] and the sensitivities of killing or maiming someone accidentally." *Id*. (alteration in original). Given the nature of this deployment, the Court finds that the servicemen were non-combatants operating under peacetime rules of engagement.

During the *Peterson* trial, the Court heard the videotaped deposition of a Hezbollah member known by the pseudonym "Mahmoud." 264 F. Supp. 2d at 54. Mahmoud is a Lebanese Shi'ite Muslim, and was part of the group that carried out the attack on the Marine barracks in 1983. He provided the following information concerning the planning and execution of the bombing:

In 1983, high-ranking members of Hezbollah and a member of the Iranian Revolutionary Guard Corps, acting at the direction of the Iranian Ambassador to Syria, met in Baalbek,

Lebanon. *Id*. at 55. At this meeting, the individuals "formed a plan to carry out simultaneous attacks against the American and French barracks in Lebanon." *Id*. Subsequent to these discussions, members of Hezbollah disguised a 19-ton truck to resemble a water delivery truck that regularly traveled to the Beirut International Airport, near the U.S. Marine barracks, and rigged the truck so that it could carry an explosive device. *Id*. at 56. On the morning of October 23, 1983, a group of Hezbollah operatives ambushed the real water delivery truck, and the fake truck was sent to the barracks, driven by an Iranian member of Hezbollah. Upon reaching the barracks, the fake truck increased its speed and broke through the wire and sandbag barriers surrounding the facility. Once the truck reached the center of the barracks, the bomb it carried was detonated. *Id*.

The *Peterson* Court also received substantial testimony concerning the explosion and its aftermath. Danny A. Defenbaugh, the on-scene FBI forensic explosive investigation, testified as an expert before the Court and explained that the explosion was, at the time, "the largest non-nuclear explosion that had ever been detonated on the face of the Earth," with a force that "was equal to between 15,000 to 21,000 pounds of TNT." *Id*. Steve Russell, the sergeant of the guard at the time of the attack, stated that the bomb left many victims mangled and in severe pain. *Id*. at 58. In particular, Wireman Anderson suffered severe burns and abrasions, Report of Special Master (Anderson) at 4, Corpsman Alvarado sustained a number of contusions and bruises, Report of Special Master (Alvarado) at 6, and Lance Corporal Thompson suffered a cracked hip and broken wrist, as well as several lacerations on his fact. Report of Special Master (Thompson) at 6. In all, the attack on the barracks killed 241 U.S. servicemen, and left countless others severely injured, both physically and emotionally. *Peterson*, 264 F. Supp. 2d at 58.

*Iranian Involvement in the Marine Barracks Bombing*

The testimony of Mahmoud establishes that the barracks bombing was undertaken by members of Hezbollah.[4]  In *Peterson*, this Court found that the group Hezbollah "was formed under the auspices of the government of Iran."  264 F. Supp. 2d at 51.  This determination was based on the testimony of several expert witnesses in the *Peterson* trial.  First, Dr. Patrick Clawson, a "widely-renowned expert on Iranian affairs," testified that Hezbollah was a creature of the Iranian government:  "Hezbollah is largely under Iranian orders.  It's almost entirely acting at the – under the order of the Iranians."  *Id*. at 51.  Second, Dr. Reuven Paz, "who has researched Islamist terrorist groups over the last 25 years," stated that "at that time – even today, but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest."  *Id*. at 52.  Finally, Robert Baer, "a case officer in the Directorate of Operations of the CIA," explained that, at the time of the 1983 bombing, Hezbollah was constituted by "a bunch of agents of Iran."  *Id*. at 52–53 n.10.  Thus, the Iranian government was directly tied to the actions undertaken by the members of Hezbollah in the attack on the U.S. Marine barracks.

In addition to evidence concerning Iran's role in creating and supporting Hezbollah, plaintiffs in *Peterson* also presented testimony concerning an intercepted message from MOIS to an Iranian official orderings attacks against U.S. Marines.  Admiral James A. Lyons—who at the time was the Deputy Chief of Naval Operations for Plans, Policy and Operation—"routinely received intelligence information about American military forces" during the period leading up to the 1983 bombing.  *Id*. at 54.  Admiral Lyons testified about a message from MOIS to the Iranian ambassador to Syria, directing the Ambassador to contact a terrorist leader and "instruct him to have his group instigate attacks against the multinational coalition in Lebanon, and 'to

---

[4] Hezbollah is synonymous with "Hizbollah," which is merely a "variant transliteration[] of the same name."  *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 273 n.3 (D.D.C. 2007) *rev'd on other grounds*, 573 F.3d 835 (D.C. Cir. 2009).

take a spectacular action against the United States Marines.'"  *Id*.  Additional evidence showed that, following these instructions, this Ambassador to Syria then instructed an Iranian Revolutionary Guard Corp officer to attend a meeting with Hezbollah operatives, and that the attack on the Marine barracks was planned at that meeting.  *Id*. at 54–55.  Based on this evidence, the Court finds that both Iran and MOIS played crucial and necessary roles in planning and ordering the 1983 bombing.

Finally, testimony from explosives experts at the *Peterson* trial also points to Iranian involvement in the attack.  At trial, experts from both the FBI and AFT "concluded that the explosive material" in the bomb "was 'bulk form' pentaerythritol tetranitrate, or PETN."  *Id*. at 56.  Mr. Defenbaugh, the FBI investigator, then explained that the 'bulk form' of PETN, rather than the manufactured form, "is not generally sold commercially," and that—at the time of the attack—bulk form PETN "was manufactured within the borders of Iran."  *Id*. at 57.  And Warren Parker, a forty-year veteran explosives expert for the Army and ATF, testified that "[t]hese are not things that you just go down to the drugstore and buy a pound of . . . . it is a state- or military-run factory that produces this type of material."  *Id*. at 57–58.  Based on this testimony, the Court concurs and adopts its finding in *Peterson* that "Hezbollah and its agents received massive material and technical support from the Iranian government. . . . [I]t is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran."  *Id*. at 58.

*Iranian Support for Terrorism*

In addition to the direct support of Hezbollah for the purpose of carrying out the horrific bombing of the U.S. Marine barracks in 1983, the evidence presented at the *Peterson* trial demonstrates that Iran has also played a critical role in support for terrorism more generally.  At

the *Peterson* trial, Dr. Clawson estimated that between 1983 and 1988, the Iranian government annually spent approximately $ 50 to $150 million financing terrorist organizations in the Near East. *Id*. at 51. In funding such operations, Iran uses MOIS to exercise operational control over groups such as Hezbollah. *Id*. at 53. And these activities have only intensified and worsened: In an affidavit filed with this Court in *Valore*, Dr. Clawson estimates that today the "financial material support provided by Iran in support of terrorism is in the range of $ 300 million to $ 500 million a year." 700 F. Supp. 2d at 88.

## IV.    CONCLUSIONS OF LAW

Based on these findings of fact, the Court reaches the following conclusions of law:

### A.    Jurisdiction

Subject to certain enumerated exceptions—including the state-sponsored terrorism exception—the FSIA simultaneously provides immunity to foreign states from suit and denies all U.S. federal and state courts jurisdiction over such actions. 28 U.S.C. § 1604. Under certain conditions, however, courts obtain original jurisdiction for suits against foreign states, and those states' general immunities are waived by operation of statute. Based on the evidence here, these conditions have been met.

#### 1.    Original Jurisdiction

The state-sponsored terrorism exception provides that federal courts possess original jurisdiction over suits against a foreign state only if (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." *Id*. at § 1605A(a)(1).

Here, each of these prerequisites is met.  First, plaintiffs have only identified monetary remedies in their Complaint, Amended Complaint at 7–10, rendering this a suit involving only "money damages."  Second, defendant Iran is plainly a foreign state.  With respect to defendant MOIS, the FSIA defines foreign state to include "a political subdivision . . . or an agency or instrumentality of a foreign state."  *Id.* at § 1603(a).  Applying this definition, courts in this jurisdiction have been directed to ask whether an entity "is an integral part of a foreign state's political structure"; if so, that defendant is treated as a foreign state for FSIA purposes.  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted).  Here, the evidence establishes that MOIS is a division of the state of Iran that acted as a conduit for the state's provision of funds to terrorist organizations, including Hezbollah.  *See supra* Section III.B.  Defendant MOIS is thus a foreign state for purposes of these proceedings.  *See Oveissi*, 498 F. Supp. 2d at 275 (finding MOIS to constitute a foreign state).  Third, the testimony presented to the special masters in *Valore* establishes that each of the servicemen at the center of this action suffered both physical and mental injuries as a result of the attack.  *See supra* Section III.B.  Fourth, the evidence establishes that defendant Iran founded Hezbollah for the purpose of undertaking attacks such as the 1983 bombing and funneled money to the terrorist organization through defendant MOIS, and also demonstrates that both defendants played necessary planning, logistical and support roles leading up the horrific attack.  *See id.* This is more than sufficient to satisfy the FSIA's requirement that there be "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered."  *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted).  Finally, the 1983 bombing constitutes an extrajudicial killing that occurred as a direct and proximate result of

defendants' conduct in providing financial and military assistance to the attackers. On the basis of these findings, the Court has jurisdiction over plaintiffs' claims.

### 2. Waiver of Sovereign Immunity

While this Court's exercise of jurisdiction over this action is a necessary prerequisite to moving forward, foreign states remain immune from suit absent a waiver of sovereign immunity. Waiver of a foreign states' immunity can occur either by that state's own action or by operation of statute. The state-sponsored terrorism exception provides that such waiver occurs where (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . or was *so designated as a result of such act*, and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claims is filed under this section," (2) the claimant or the victim was, at the time of the act . . . a national of the United States [or] a member of the armed forces [or] otherwise an employee of the Government of the United States . . . acting within the scope of the employee's employment," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(i)–(iii) (emphasis added).

Here, the established facts warrant waiver of defendants' sovereign immunity as provided by the FSIA. First, Iran was designated by the U.S. Secretary of State as a sponsor of terrorism, partially in response to the Beirut bombing. U.S. Dep't of State, *Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984 (designating Iran upon concluding that "Iran is a country which has repeatedly provided support for acts of international terrorism"). Second, all three victims of the attack—servicemen Anderson, Alvarado and Thompson—were U.S. citizens, and each plaintiff is as well. *See supra*

Section III.B. Finally, because the bombing occurred at the Marine barracks in Lebanon—and not Iran—the FSIA's requirement that defendants be given an opportunity to arbitrate this claim is inapplicable here. For these reasons, defendants' immunity is waived and they may be held liable for the attack which left 241 U.S. servicemen dead, and numerous others severely injured.[5]

## B. Retroactive Application of § 1605A to this Case

The NDAA provides that § 1605A may be applied retroactively under particular circumstances. Specifically, "a plaintiff in a case pending under former § 1605(a)(7) may move the Court to have that case treated as if brought under § 1605A, or a plaintiff may bring a separate action under § 1605A within a specified range following final judgment in the earlier related proceeding." *Rimkus*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS at *46. Under the latter approach, a FSIA plaintiff must file a related action "not later than the latter of 60 days after (A) the date of entry of judgment in the original action; or (B) the date of the enactment of this Act." NDAA § 1083(c)(3). Judgment was issued in the related *Valore* case on March 31, 2010.[6] 700 F. Supp. 2d at 90. This action was filed in March of 2008—well before 60 days after entry of judgment in *Valore*. The Court shall therefore apply § 1605A retroactively to Plaintiffs' claims for relief.[7]

---

[5] Plaintiff served the Amended Complaint on defendants through diplomatic channels on June 1, 2010, as authorized under FSIA, 28 U.S.C. § 1608(a)(4). Return of Service/Affidavit, Aug. 20, 2010 [21]. The Court thus has personal jurisdiction over the defendants. *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (Lamberth, J.) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under §1608).

[6] Another requirement of § 1083(c)(3)'s retroactive procedures is that the original action to which the action before the Court is related must have been "timely commenced under section 1605(a)(7)." NDAA § 1083(c)(3). *Valore* was originally brought under § 1605(a)(7), and thus fits this criteria. 700 F. Supp. 2d at 57.

[7] The Court is aware that plaintiffs, in filing their Amended Complaint in this action, did not bring a separate proceeding as contemplated in the related action procedures found in the NDAA. *See* NDAA § 1083(c)(3) (stating that, where prior § 1605(a)(7) proceeding was pending, "any other action arising out of the same act or incident *may be brought under section 1605A*") (emphasis added). Instead, the act of filing an Amended Complaint, as plaintiffs did here, is much more akin to the re-filing procedures outlined in the prior actions section of the Act. *See id.* at § 1803(c)(2) (stating that "[a] motion may be made *or an action may be refiled*" under § 1605A) (emphasis added). Indeed, this Court has previously noted that "§ 1083(c)(3) pertaining to related actions . . . is really a vehicle best reserved for those cases that had reached a final judgment and were not before the courts at time

## C. Estate-Plaintiff Standing

Four of the six plaintiffs in this action are either estates, representatives of decedents, or direct heirs bringing a right of action on behalf of decedents. These plaintiffs do not bring actions related to the decedent's own deaths, but instead seek recovery for emotional and mental anguish that the decedents suffered while still alive. Such recovery for pain and suffering, however, is not universally available to estate-plaintiffs. *See, e.g.*, Cal. Code Civ. P. § 377.34 ("In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable . . . do not include damages for pain,

---

of the enactment of the 2008 NDAA." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 91 (D.D.C. 2009).

    Were the Court to treat plaintiffs' filing of the Amended Complaint as a request for application of § 1083(c)(2), however, such a request would be untimely. Congress explicitly limited the use of the prior action procedures to a strict 60-day period following the act. *See* NDAA § 1083(c)(2)(C)(ii) (stating that motions or refilings under § 1083(c)(2) must be made "within the 60-day period beginning on the date of the enactment of this Act"); *see also Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 5 n.1 ("[T]o benefit from § 1605A, a plaintiff in an action pending under § 1605(a)(7) must, within 60 days from the date of the NDAA's enactment, either (1) refile the action; or (2) file a motion for an order giving effect to the action as if it had originally been filed under § 1605A."). By the plain terms of the Act, the window to invoke the prior action procedures thus expired on March 28, 2008. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 65. Plaintiffs here filed the Amended Complaint more than a year after the expiration of this window. *See supra* Section II.B.

    The Court is also mindful, however, that at the time plaintiffs filed the Amended Complaint, they were proceeding with a timely action under § 1605(a)(7). Under the plain terms of the NDAA, they were therefore eligible to bring a separate action under the related action procedures outlined in the Act. *See* NDAA § 1083(c)(3) ("If an action arising out of an act of incident has been timely commenced under section 1605(a)(7) . . . any other action arising out of the same act or incident may be brought under section 1605A."). Using this action as the "original" suit, plaintiffs could have brought a separate but related action under § 1605A. In light of the fact that plaintiffs were capable of bringing such a suit, the Court does not see why it should punish plaintiffs for instead choosing to amend their original Complaint.

    Moreover, no purpose is served by the Court requiring future plaintiffs in timely § 1605(a)(7) actions to file an entirely separate action, rather than amending their complaints to state a cause of action under § 1605A. Were the Court to do so, two separate results may obtain. First, plaintiffs may choose to then pursue two parallel actions—one under former § 1605(a)(7), and one under § 1605A. There is no benefit to either plaintiffs or defendants of having simultaneous litigations, while the costs to the Court—in terms of time, repetition, and needless complication—has already been established. *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 91–92 ("[R]equiring this Court to maintain two nearly identical actions on the docket . . . and will inevitably require this Court to flip back and forth between dozens of related cases involving hundreds upon hundreds of repeat plaintiffs. . . . [S]uch a result wastes time and resources, and invites great confusion.") Second, if plaintiffs instead (reasonably) choose to pursue only their newly filed action under § 1605A while voluntarily dismissing their prior § 1605(a)(7) action, absolutely nothing has been gained. The Court is left with a single action under § 1605A—just as it is now when it permits plaintiffs to simply amend their complaints—while procedural maneuvering has imposed needless delay and waste into already time-consuming proceedings.

    For these reasons, the Court finds the filing of the Amended Complaint in this action to constitute invocation of the related action procedures of the NDAA, and that plaintiffs' filing in this regard was timely under the terms of § 1083(c)(3)(A).

suffering, or disfigurement"). Thus, before determining whether plaintiffs have stated a valid cause of action under § 1605A, the Court must first determine whether these estate-plaintiffs have standing to pursue such claims in this case.

As the D.C. Circuit Court of Appeals has previously explained, because an action brought pursuant to the state-sponsored terrorism exception is based on a federal statute, the "extent and nature" of the claims brought under the FSIA is a federal question. *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). However, an estate's standing to maintain a cause of action seeking damages for injuries suffered during the decedent's lifetime is not an issue touching on the "extent and nature" of the estate's underlying claim, but rather is a threshold question concerning the powers of the estate to bring and maintain legal claims. Such questions are governed by the law of the state which also governs the creation of the estate. This is plainly supported by Congress' purpose in creating a federal cause of action under § 1605A, which is to ensure that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. If an estate-plaintiff would not be permitted to bring suit against a private individual due to the operation of the state law governing the estate—which is plainly unrelated to the "extent and nature" of the specific cause of action— nothing in the FSIA indicates that the same estate-plaintiff should otherwise be permitted to bring an identical claim against a foreign state. Bearing these principles in mind, the Court shall examine the state law applicable to each of the estate-plaintiffs in this action.

*Estate of Dennis Jack Anderson, Sr.*

The estate of Wireman Anderson's father is governed by Georgia law. Declaration of Joseph Peter Drennan ¶ 2, Nov. 23, 2010 [29] ("Drennan Decl."). The Georgia Civil Practice Act makes clear that "[n]o action for a tort shall abate by the death of either party," Ga. Code.

Ann. § 9-2-41, and that "the cause of action shall . . . survive to . . . the legal representative of the deceased party. *Id*. at § 9-2-40. In 1952, these rules were amended, inserting the phrase "cause of action." As the Georgia Court of Appeals has made clear, the purpose of this amendment was to expand the rule's prior applicability to pending cases only so as to include rights of actions that a decedent possessed, but had not yet exercised. *See Posner v. Koplin*, 94 S.E.2d 434, 437 (Ga. Ct. App. 1956) (noting that amendment "made the provisions of the act of 1889 applicable to causes of action or rights of action, as opposed to pending suits which alone were dealt with in that act"). Thus, because Georgia state courts frequently entertain suits, without limitation, brought by estate representatives for personal injury suffered by the decedent while still alive, *see, e.g.*, *MARTA v. Maloof*, 698 S.E.2d 1, 3 (Ga. Ct. App. 2010); *Griffin v. Hunt Ref. Co.*, 664 S.E.2d 823, 825 (Ga. Ct. App. 2008), the Court shall permit this claim to proceed.

   *Estate of Andres Alvarado Mirabal*

   The estate of Andres Alvardo Mirabal, father to Corpsman Alvarado, is governed by the laws of New York. Drennan Decl. ¶ 3. The ability for a New York estate or representative to bring a personal injury action belonging to the decedent is governed by New York's Estates, Powers and Trusts Law. The relevant provision provides: "No cause of action for injury to person . . . is lost because of the death of the person in whose favor the cause of action existed. For any injury an action may be brought . . . by the personal representative of the decedent." N.Y. E.P.T.L. § 11-3.2. As the New York Court of Appeals very recently made clear, this provision ensures that "all tort and contract actions that belonged to a decedent may now be maintained by the estate's personal representative." *Heslin v. County of Greene*, 923 N.E.2d 1111, 1114 n.4 (N.Y. 2010). The estate of Mr. Mirabal therefore has standing here.

   *Estate of Nerida Tull-Baex*

The estate of Corpsman Alvarado's mother is governed by the laws of Puerto Rico. Drennan Decl. ¶ 4. District Courts in the First Circuit have had numerous opportunities to discuss the application of Puerto Rico law on this matter, and have reached a consensus that "the Puerto Rico law regarding causes of action by members of an estate permits individual members to bring a cause of action for the decedent's pain and suffering." *Martinez-Alvarez v. Ryder Mem'l Hosp.*, No. 09 Civ. 2038, 2010 U.S. Dist. LEXIS 90499, at *46 (D.P.R. Aug. 31, 2010); *see also Ruiz-Hance v. P.R. Aqueduct & Sewer Auth.*, 596 F. Supp. 2d 223, 229 (D.P.R. 2009) ("In Puerto Rico, the cause of action for the pain and suffering experienced by a decedent prior to his/her death passes on to his/her estate and is actionable by the heirs."); *Mangual v. Toledo*, 536 F. Supp. 2d 127, 134 (D.P.R. 2008) ("The law of Puerto Rico allows [decedent]'s pain and suffering to transmit to his immediate heirs, who can bring an action claiming damages for the deceased's pain."). Corpsman Alvarado, heir to his mother's estate, brings the claims on behalf of his interest in that estate, and thus may validly proceed under Puerto Rico law.

*Estate of Melvin Oley Thompson*

The estate of Melvin Oley Thompson is governed by South Carolina law. Drennan Decl. ¶ 5. The survival of the decedent's tort claim under South Carolina law is governed by the state's Civil Remedies and Procedures code, the relevant provision of which states: "Causes of action for . . . any and all injuries to the person . . . shall survive both to and against the personal or real representative . . . of a deceased person." S.C. Code Ann. § 15-5-90. The Supreme Court of South Carolina has explained that this survivability statute "has a wide ambit," and that, "[g]enerally, any cause of action which could have been brought by the deceased in his lifetime survives to his representative." *Ferguson v. Charleston Lincoln Mercury, Inc.*, 564 S.E.2d 94, 96–97 (S.C. 2002) (citing *Layne v. Int'l Bhd. Of Elec. Workers*, 247 S.E.2d 346, 349 (S.C.

1978)).  Here, Lance Corporal Thompson brings a cause of action on behalf of his deceased father, and thus has standing to pursue that claim.

### D.    Liability

Section 1605A of the FSIA creates a federal statutory cause of action for acts of terrorism.  Specifically, under the state-sponsored terrorism exception, a plaintiff can seek to hold a foreign state liable for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. §§ 1605A(a)(1) & (c).  As the Court has recently discussed at length, the third and fourth elements—causation and injury—"require plaintiffs to prove a theory of liability" in which plaintiffs articulate a justification for the recovery the damages which they seek, generally expressed "through the lens of civil tort liability."  *Rimkus*, ___ F. Supp. 2d at __; 2010 U.S. Dist. LEXIS 120991 at *28.  The Court will examine each of these elements in turn.

### 1.    Act

On the basis of the evidence presented in *Peterson*, plaintiffs here have sufficiently established that defendants were responsible for the horrific attack on the U.S. Marine barracks in Beirut in 1983, which killed 241 U.S. servicemen and left hundreds of others severely wounded.  The evidence concerning the actions of defendants Iran and MOIS demonstrates that they are culpable both for the extrajudicial killing of U.S. citizens and for the provision of material support to the members of Hezbollah participating in the bombing, in satisfaction of the first element of liability under the federal cause of action.

The FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim

Protection Act of 1991.  28 U.S.C. § 1605A(h)(7).  That Act defines an extrajudicial killing as

> [(1)] a deliberated killing [(2)] not authorized by a previous
> judgment pronounced by a regularly constituted court [(3)]
> affording all judicial guarantees which are recognized as
> indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note.  The evidence presented in

*Peterson* establishes that, prior to the attack on the U.S. Marine barracks, orders were issued by

Iran, through MOIS and to the Iranian Ambassador to Syria, instructing him to direct members

of terrorist organizations—such as those that perpetrated the attack in Beirut—to take action

against U.S. peacekeeping forces stationed in Lebanon.  *See supra* Section III.B.  There is no

evidence that this order was sanctioned by any judicial body, and the order to use force against

members of an international peacekeeping force was in direct contravention of civil guarantees

recognized as indispensable to all free and civilized peoples.  Based on these findings, the

barracks bombing constitute an extrajudicial killing, undertaken by members of Hezbollah acting

as agents for defendants Iran and MOIS.

The FSIA declares that the concept of "material support or resources" is defined by

reference to the U.S. criminal code.  28 U.S.C. § 1605A(h)(3).  That definition states that support

> means any property, tangible or intangible, or service, including
> currency or monetary instruments or financial securities, financial
> services, lodging, training, expert advice or assistance, safehouses,
> false documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel . . . and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  The evidence presented at the *Peterson* trial demonstrates that during

the period leading up to the bombing, Iran founded and supported Hezbollah for the purpose of

advancing its own agenda.  *See supra* Section III.B.  Testimony of multiple expert witnesses

establishes that Hezbollah was essentially composed of a number of Iranian agents who were

supported financially and materially by Iran and MOIS. *Id.* And more specifically, the evidence shows that the explosive materials used in the attack were of a type and grade that would only have been available to the perpetrators of the attack through direct cooperation of the Iranian government, and that these materials could only have been used as effectively as they were with military assistance and training, which was provided by MOIS. *Id.* Taken together, these acts plainly constitute the provision of material support for FSIA purposes.

### 2. Actor

The Court has determined that defendants Iran and MOIS are responsible for the provision of material support which led to the attack on the U.S. Marine barracks in Beirut. In addition, the evidence presented in *Peterson* establishes that Hezbollah acted generally as an agent of Iran during this period, and that it was a direct order emanating from defendants which prompted the barracks bombing. *See supra* Section III.B. Under such circumstances, defendants may be held vicariously liable for the extrajudicial killing perpetrated by the bombers. *See Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *50–51 (holding that defendant foreign state may be held liable where Hezbollah agents "acted at the behest and under the operational control of defendants").

### 3. Theory of Recovery – Causation & Injury

The elements of causation and injury in the federal cause of action created by § 1605A require FSIA plaintiffs "to prove a theory of liability" which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered. *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, ___ F. Supp. 2d at __; 2010 U.S. Dist. LEXIS at *28 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). When determining the contours of these theories, the D.C. Circuit Court of

Appeals has cautioned that while the "extent and nature" of such claims "are federal questions," the FSIA "does not . . . authorize the federal courts to fashion a complete body of federal law." *Bettis*, 315 F.3d at 333. Based on the Circuit Court's guidance, District Courts in this jurisdiction "rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to outline the boundaries of these theories of recovery. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009). Here, plaintiffs articulate two bases for relief: intentional infliction of emotional distress, and exemplary damages. Amended Complaint ¶¶ 10–17.

**(i)     Intentional Infliction of Emotional Distress**

Plaintiffs sets forth three Counts of intentional infliction of emotional distress—one Count for each grouping of plaintiffs related to one of the three servicemen at the heart of this action. Amended Complaint Counts I–III. Count I is brought on behalf of Emma Jean Anderson—both individually and as the representative for the estate of Dennis Jack Anderson, Sr.—and Mitchell Scott Anderson; they are Wireman Anderson's mother, father and brother, respectively. *Id*. at ¶¶ 10–11. Count II is brought on behalf of the estates of Andreas Alvarado Mirabal and Nerida Tull-Baex, the father and mother of Corpsman Alvarado. *Id*. at ¶¶ 12–13. Count III is brought on behalf of the estate of Melvin Oley Thompson, Lance Corporal Thompson's father. *Id*. at ¶¶ 14–15. Each Count sets forth similar factual allegations—that the attack on the U.S. Marine barracks caused the plaintiffs to suffer "severe mental distress, which . . . will continue." *Id*. at ¶¶ 11, 13, 15. Each individual plaintiff seeks $ 20 million in compensatory damages for their injuries.

This Court and others have frequently addressed the intentional infliction of emotional distress theory following enactment of § 1605A. Relying principally on the Restatement, courts

have set for the following standard: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)). The scope of recovery under this theory is limited by two qualifications: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time." Restatement (Second) of Torts § 46(2)(a)–(b). The former qualification is of no consequence here, as plaintiffs are either parents or siblings of the injured servicemen, and thus fall within even the strictest definition of immediate family. *See Valore*, 700 F. Supp. 2d at 79 (noting that immediate family "is consistent with the traditional understanding of one's immediate family" and includes "one's spouse, parents, siblings, and children").

The issue of presence, however, warrants a bit more discussion. Plainly, none of the plaintiffs in this action were present in Beirut and witnesses to the bombing of the U.S. Marine barracks. However, this Court has previously recognized that the presence requirement is subject to a caveat—specifically, the Restatement "'expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability.'" *Heiser*, 659 F. Supp. 2d at 26–27 (quoting Restatement (Second) of Torts § 46). As the *Heiser* Court explained: "Terrorism [is] unique among the types of tortuous activities in both its extreme methods and aims . . . . 'All acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror.'" *Id*. at 27 (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Thus, the Court concluded that a plaintiff "need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family." *Id*. Following this holding, the *Valore* Court

25

determined that the Beirut bombing qualified as an extreme and outrageous act sufficient to invoke this theory of recovery for non-present plaintiffs, 700 F. Supp. 2d at 79–80, and the Court shall do the same here. Defendants are thus liable for the mental anguish and suffering that plaintiffs have endured as a result of the attack on the U.S. Marine barracks in Beirut.

### (ii)    Punitive Damages

In addition to the three Counts of intentional infliction of emotional distress, plaintiffs set forth a final Count on behalf of all plaintiffs, titled "Exemplary Damages." Amended Complaint ¶¶ 16–17. The Count alleges that defendants' actions "were malicious, misanthropic, willful, unlawful, and in wanton disregard of life and the standards of law which govern the actions of civilized nations," and seeks an award of $250 million in punitive damages. *Id.*

It is a well-established principle that "punitive damages is not an independent cause of action." *Botvin v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 25 (D.D.C. 2009) (internal quotations omitted). The Court recently grappled with claims solely for punitive damages under the FSIA in *Rimkus*, explaining that "a plaintiff must set forth an independent claim—generally sounding in intentional tort or strict liability—for which punitive damages may be an appropriate *remedy*." ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *26 (emphasis own; citing Restatement (Second) of Torts § 908 cmt. c (1979)). In *Rimkus*, the Court permitted the plaintiff's claim for punitive damages to go forward after determining that the plaintiff had "specifically alleged" a claim under FSIA by setting forth "each element in the federal cause of action provided by § 1605A." *Id.*[8]

---

[8] Though the Court permitted the plaintiff's claim in *Rimkus* for punitive damages to proceed, it did emphasize that "future plaintiffs in all § 1605A actions . . . [should] clearly articulate the theories of recovery in future actions," rather than submitting merely an outline of the language found in § 1605A. ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *30.

Here, plaintiffs have not attempted to set forth a complete cause of action under Count IV, but rather rely primarily on the nature of defendants' conduct in this case to sustain their claims for punitive damages. Amended Complaint ¶ 17. This is plainly insufficient, *see Iacangelo v. Georgetown Univ.*, 580 F. Supp. 2d 111, 114 (D.D.C. 2008) (dismissing "free-standing punitive damages claim as improperly pled"), and Count IV should be dismissed.

This is not to say, however, that plaintiff may not recover punitive damages in this action. As the *Rimkus* Court also made clear, where appropriate, punitive damages may be pursued as a remedy to an intentional tort. ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *26. Here, as seen above, plaintiffs have set forth proper causes of action for intentional infliction of emotional distress—an intentional tort. The Court will thus treat Count IV of the Amended Complaint as requesting the remedy of punitive damages in relief of the claims set forth in Counts I–III. *See Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 66 (D.D.C. 2006) (noting that "punitive damages are not an independent cause of action" but treating plaintiff's claim for punitive damages "as part of an ad damnum clause").

### 4. Jurisdiction

The Court has already determined that it is proper to exercise jurisdiction over defendants in this action, and that plaintiffs are only seeking monetary compensation. *See Supra* Section V.A. This element is thus satisfied, and defendants may be properly held liable under the federal cause of action embodied in § 1605A for the 1983 bombing of the U.S. Marine barracks, which resulted in numerous injuries to servicemen Anderson, Alvarado and Thompson, and caused members of their families to suffer severe mental anguish as a result.

## V. SPECIAL MASTERS

Though the Court has determined that defendants are liable to plaintiffs under the FSIA, it also lacks evidence necessary to render an appropriate measure of damages. In determining the proper measure of damages, "[t]he courts of the United States may appoint special masters to hear damages claims brought under" the state-sponsored terrorism exception to the FSIA. 28 U.S.C. § 1605A(e)(1). Here, appointment of a special master would not impose undue expenses on any party and will not result in unreasonable delay—a prerequisite set forth in Fed. R. Civ. P. 53(a)(3). To the contrary, the use of special masters will affirmatively assist the Court in the efficient resolution of claims in this action.

As noted extensively above, this case is related to the *Peterson* case, and as a result it is subject to the administrative plan for special masters first set forth in that action. *See* Amended Administrative Plan Governing Appointed Special Masters 1, July 30, 2003, *Peterson*, No. 01 Civ. 2094 [29] (noting that the plan applies to "any other cases arising out of the October 23, 1983 occurrence at Beirut, Lebanon assigned to Judge Royce C. Lamberth in which special masters are appointed") ("Plan"). The Plan requires that plaintiffs provide the Court, within thirty days of the adoption of the Plan, with the potential master's curriculum vitae, and that the potential master submit an affidavit to the court disclosing whether there is any ground for his or her disqualification under 28 U.S.C. § 455, consistent with Rule 53. *Id.* at 2. Location and appointment of a special master is therefore the next step in this action.

## VI. CONCLUSION

On October 23, 1983, plaintiffs here could only sit in horror upon learning of the tragic and devastating destruction of the U.S. Marine barracks in Beirut, Lebanon. At that time, there was no way for these individuals to know whether their sons or brother—who were stationed in Beirut as part of a peacekeeping operation—were dead or alive. Thankfully, despite the efforts

of Iran and MOIS to inflict of maximum devastation and death, servicemen Anderson, Alvarado and Thompson escaped with their lives. Plaintiffs, however, still suffered greatly, both from the thought that their close relatives might be dead, and from fear arising from the knowledge that a close member of their family had been the victim of a horrific terrorist attack. The Court, however, lacks sufficient evidence to render any determination concerning the appropriate amount of damages to be awarded to plaintiffs here. Thus, the Court holds that defendants Iran and MOIS are legally liable to plaintiffs for the emotional and mental anguish they suffered as a result of the Beirut bombing, and directs plaintiffs to submit a motion for appointment of a special master to assist the Court in making an appropriate determination of damages.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on December 1, 2010.